## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

NAACP FAYETTE- SOMERVILLE
BRANCH, CHRISTINE WOODS, THOMAS
GILMORE, VELISA FITZPATRICK,
WILLIE LUELLEN, and MARANDY
WILKERSON

     *Plaintiffs*,

     vs.

FAYETTE COUNTY, TENNESSEE, THE
FAYETTE COUNTY BOARD OF COUNTY
COMMISSIONERS, FAYETTE COUNTY
ELECTION COMMISSION BOARD, and
JOSHUA J. TAPP, in his official capacity as
Fayette County Administrator of Elections,

     *Defendants*.

Civil Action No. _____

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

## <u>INTRODUCTION</u>

1.    In 1959, when Black farmers in Fayette County, Tennessee began registering to vote, they were evicted from their homes, denied services at stores, banks, and doctors' offices, and violently harassed in retaliation for exercising their constitutional rights.

2.    This Court permanently enjoined landowners, merchants, and one financial institution in Fayette County from engaging in acts for the purpose of interfering with the right of any person to register to vote.

3.    More than 60 years later, the promise of full citizenship and equal access to the political process remains unfulfilled for Black voters in Fayette County.

4.      The nineteen-member 2021 ten-district plan ("2021 Plan") for the Fayette County Board of County Commissioners ("County Commission") dilutes Black voting strength in violation of the Voting Rights Act of 1965 ("VRA") and the U.S. Constitution.

5.      Although Fayette County's Black population is more than 25% and voting-age Black residents of Fayette County reside in substantial numbers in geographically compact areas, none of the nineteen County Commissioners are Black or were the Black-preferred candidates.

6.      Fayette County elections are characterized by racially polarized voting in that Black and white voters tend to support different candidates.

7.      In recent elections, large majorities of Fayette County's Black voters have supported one candidate, while large majorities of Fayette County's white voters have supported the opposing candidate.

8.      White voters' preferred candidates have regularly defeated Black-preferred candidates in these elections.

9.      None of the ten districts are composed of a majority of Black voters.

10.     The County Commission's willful refusal to provide Black voters with any, let alone equal, opportunity to access representation on the County Commission is a product of intentional discrimination and a continuation of Fayette County's ongoing discrimination against Black people.

11.     In enacting the 2021 Plan, the County Commission deviated from its guidelines' instruction to protect minority voters' opportunity to elect their preferred candidates and failed to heed its legal counsel's public warnings that failing to draw districts comprised of a majority-Black voting-age population could expose Fayette County to legal liability.

12.     The County Commission also rejected alternative proposed plans that respected its guidelines and would have mitigated the racially discriminatory impact that community members and some County Commissioners repeatedly raised.

13.     The County Commission's intentionally dilutive 2021 Plan has resulted in the denial of equal opportunity for Black people to participate in the political process and elect their preferred County Commission candidates in violation of the Fourteenth and Fifteenth Amendments to the U.S. Constitution and Section 2 of the VRA.

14.     Even in the absence of intentional discrimination, the 2021 Plan results in discrimination in violation of Section 2 of the VRA because Black voters are denied the right to participate equally in the political process and elect candidates of their choice under the totality of the circumstances.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343, and 1357 because it arises under the laws and Constitution of the United States, as well as 42 U.S.C. §§ 1983 and 1988 and 52 U.S.C. §§ 10301 and 10302.

16.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. §§ 1343(a)(4) and 1357 because this is a civil action to secure equitable relief under Section 2 of the VRA, an Act of Congress that protects the right to vote.

17.     This Court has jurisdiction to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and 52 U.S.C. §§ 10301, 10302, and 10308(f).

18.     This Court has personal jurisdiction over Defendants, a County of the State of Tennessee and its officers who are citizens of Tennessee.

19.    Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims have occurred and are occurring in the Western District of Tennessee.

## PARTIES

20.    Plaintiff NAACP Fayette-Somerville Branch ("Fayette-Somerville NAACP") is a unit of the National Association for the Advancement of Colored People, Inc., a national non-profit, non-partisan organization founded in 1909 with more than 2,200 chapters, branches, and units across the United States.

21.    Founded in 1960, the Fayette-Somerville NAACP advocates for political, educational, social, and economic equality for all, and works to dismantle racism and racial discrimination by using the nation's democratic processes.

22.    For decades, the Fayette-Somerville NAACP has worked to expand voting rights and ensure fair representation for the County's Black residents.

23.    Toward those goals, the Fayette-Somerville NAACP holds voter registration drives throughout Fayette County.

24.    The Fayette-Somerville NAACP also facilities voter engagement by publicizing election information and promoting voter turnout.

25.    The Fayette-Somerville NAACP is a membership organization with members throughout Fayette County.

26.    The Fayette-Somerville NAACP's membership includes Black citizens who are lawfully registered voters and residents of areas of Fayette County where reasonably configured districts comprised of a majority of Black voters can be drawn consistent with guiding principles map drawers traditionally use to develop redistricting plans.

27.     During the 2021 redistricting process, Fayette-Somerville NAACP members attended meetings, reviewed proposed plans, raised concerns during public comment, and encouraged the County Commission to adopt a map that would allow fair representation for Fayette County's Black residents.

28.     Plaintiff Christine Woods is a Black registered voter who is a resident of Fayette County.

29.     Ms. Woods resides in an area of Fayette County that could constitute a reasonably configured single-member district containing a majority-Black voting-age population, which could provide a remedy for the existing Section 2 and constitutional violations.

30.     Plaintiff Thomas Gilmore is a Black registered voter who is a resident of Fayette County.

31.     Mr. Gilmore resides in an area of Fayette County that could constitute a reasonably configured single-member district containing a majority-Black voting-age population, which could provide a remedy for the existing Section 2 and constitutional violations.

32.     Plaintiff VeLisa Fitzpatrick is a Black registered voter who is a resident of Fayette County.

33.     Ms. Fitzpatrick resides in an area of Fayette County that could constitute a reasonably configured single-member district containing a majority-Black voting-age population, which could provide a remedy for the existing Section 2 and constitutional violations.

34.     Plaintiff Willie Luellen is a Black registered voter who is a resident of Fayette County.

35.     Mr. Luellen resides in an area of Fayette County that could constitute a reasonably configured single-member district containing a majority-Black voting-age population, which could provide a remedy for the existing Section 2 and constitutional violations.

36.     Plaintiff Marandy Wilkerson is a Black registered voter who is a resident of Fayette County.

37.     Ms. Wilkerson resides in an area of Fayette County that could constitute a reasonably configured single-member district containing a majority-Black voting-age population, which could provide a remedy for the existing Section 2 and constitutional violations.

38.     Defendant Fayette County, Tennessee is a political and geographic subdivision of the state of Tennessee.

39.     Defendant County Commission is the elected county legislative body responsible for governing Fayette County.

40.     The County Commission is responsible for drawing county commission district boundaries.

41.     Defendant Fayette County Election Commission Board is responsible for, among other tasks, administering all public elections in Fayette County in accordance with applicable laws.

42.     Defendant Joshua J. Tapp is the Administrator of Elections for the Fayette County Election Commission Board and was responsible for, among other tasks, assisting the County Commission in the planning and implementation of the 2021 Plan.

## FACTS

### A. The County Commission

43.     The County Commission has nineteen elected commissioners.

44.     The nineteen County Commissioners are elected from ten districts, which include districts comprised of a single member and districts comprised of multiple members.

45.     County Commissioners serve four-year terms.

46.     County Commissioners must reside within and be a qualified voter of the district they represent.

47.     The next primary election for all nineteen County Commission seats is scheduled to take place in March 2026.

48.     The next general election for all nineteen County Commission seats is scheduled to take place in August 2026.

**B.   The 2021 Fayette County Redistricting Process**

49.     In February 2021, the County Commission established a Redistricting Committee to assist it with the redistricting process and prepare redistricting plans after the publication of the 2020 Census results.

50.     The Redistricting Committee had five members: the Fayette County Administrator of Elections, the Fayette County Mayor, one School Board member, one County Commissioner, and one other member.

51.     Four of the five Redistricting Committee members were white, and the other member was Black.

52.     The Redistricting Committee met for the first time on October 5, 2021.

53.     While addressing everyone in attendance, Fayette County Mayor Rhea Taylor reportedly stated that the County Commission's map cannot dilute votes on a minority basis.

54. Mayor Taylor's statement was consistent with the Tennessee Comptroller of the Treasurer's guidance to municipalities in Tennessee regarding protecting minority voters against vote dilution under the VRA and the U.S. Constitution.

55. During the redistricting process, the County Commission authorized Matthew Hill, a representative of the Tennessee Comptroller's Office, to create redistricting plans.

56. During the October 5 meeting, Mr. Hill presented an overview of that redistricting guidance, which included rebalancing populations among districts, while respecting communities of interest, ensuring districts are compact and contiguous, and not diluting minority voters' opportunity to elect their preferred candidates.

57. During the meeting, the Redistricting Committee reviewed several proposed redistricting plans.

58. One plan the Redistricting Committee reviewed had nineteen single-member districts ("19 District Plan"), which included two districts comprised of a majority of minority voters ("majority-minority districts").

59. County Commissioner Kevin Powers reportedly remarked that the 19 District Plan was the fairest among the maps being considered.

60. Community members expressed support for the 19 District Plan.

61. The Redistricting Committee met again on October 12, 2021 and unanimously voted to recommend three maps for the Joint Commission Committee's review: (1) the 19 District Plan, (2) a 9 District Plan titled "Oakland 9," and (3) a 10 District Plan titled "District 7 Split."

62. The Joint Commission Committee was made up of the members of the Redistricting Committee and the County Commission.

63.    The Joint Commission Committee considered the three plans during its meeting on October 14, 2021.

64.    During public comment, one community member reportedly raised a concern that neither the Oakland 9 nor the District 7 Split Plans had a majority-minority district.

65.    City of Piperton Mayor Henry Coats reportedly voiced support for the 19 District Plan because he said it created two majority-minority districts.

66.    County Commissioner Terry Leggett reportedly stated that the 19 District Plan complied with the Tennessee Comptroller's Office's guidelines.

67.    In response to concerns about the lack of majority-minority districts in some proposed maps, a Redistricting Committee member reportedly stated, "Well, why do we even have to consider minorities? We've never considered [them] before." Dulce Torres Guzman, *Why Do We have to Consider Minorities?*, TENNESSEE LOOKOUT (Dec. 9, 2021), https://tennesseelookout.com/2021/12/09/why-do-we-have-to-consider-minorities/.

68.    The Joint Commission Committee voted down a motion to recommend the 19 District Plan to the County Commission.

69.    The Joint Commission Committee voted to send the 19 District Plan and three other plans, including the Oakland 9 Plan, the District 7 Split Plan, and a 9 District Plan titled "Amended 8," back to the Redistricting Committee.

70.    The Redistricting Committee considered these four plans during its next meeting on October 18, 2021.

71.    During public comment, when referencing the Oakland 9, District 7 Split, and Amended 8 Plans, two community members criticized the Redistricting Committee for not

addressing the Tennessee Comptroller's guideline to protect against the dilution of minority voting power.

72.     During the redistricting process, County Commissioners and community members referred to this guideline as "minority representation" for shorthand reference.

73.     City of Oakland Mayor Mike Brown reportedly stated that the 19 District Plan was the only map of the four proposed plans that had legitimate majority-minority districts.

74.     The Redistricting Committee met again on October 25, 2021.

75.     During that meeting, the Redistricting Committee voted unanimously to instruct Mr. Hill to create plans that accomplished the following: (a) keep districts compact and contiguous, (b) keep overall deviation below 10%, (c) create 2 majority-minority districts as well as consider creating or strengthening a third majority-minority district, (d) keep cities and communities together, and (e) try to work with existing polling places.

76.     On October 26, 2021, the County Commission voted unanimously to hire John Ryder, an attorney specializing in redistricting law, because of the County Commission's concerns about a potential lawsuit.

77.     The County Commission had received a letter from an attorney representing a coalition of Fayette County officials and residents.

78.     The letter raised the prospect of a potential lawsuit if the County Commission failed to protect minority populations during the redistricting process.

79.     During the redistricting process, Mr. Ryder advised the County Commission that it needed to use Black voting-age population numbers in considering whether minority voters are able to elect candidates of choice in a particular district.

80.     During the Redistricting Committee's next meeting on November 2, 2021, Mr. Hill presented four potential plans, each of which he claimed contained three majority-minority districts.

81.     In presenting these plans, Mr. Hill explained that these four maps were created based on the Redistricting Committee's guidelines adopted on October 25.

82.     One of these four plans was the 14 District Plan.

83.     When discussing these plans, Mayor Taylor reportedly stated that Mr. Ryder had recommended the 14 District Plan because it contained three majority-minority districts, had the lowest population deviation among the plans, and was compact and consistent with existing polling places.

84.     Mayor Taylor reportedly added that Mr. Ryder said the 14 District Plan would pass in most courts.

85.     The Redistricting Committee passed a motion to recommend the 14 District Plan and another plan titled "13 District, Option 2 Plan" to the County Commission.

86.     The County Commission held a special meeting on November 16, 2021 to discuss these two plans.

87.     During the meeting, Mayor Taylor presented both plans and reportedly stated that both contained three majority-minority districts.

88.     Yet County Commissioner Claude Oglesby moved to adopt a third plan titled "District 7 Split Plan As Revised on 10/18/2021" ("District 7 Split Modified Plan").

89.     In response, County Commissioner Tim Goodroe reportedly characterized that plan as appalling because it had no majority-minority districts even though several proposals on the table had such districts.

90.     Commissioner Goodroe asked Jacob Swatley, an attorney who worked with Mr. Ryder and represented him at the November 16 meeting, about the potential ramifications of moving forward with the District 7 Split Modified Plan.

91.     Mr. Swatley reportedly warned the County Commission that it could face litigation for failing to draw majority-minority districts if it had the opportunity to draw those districts.

92.     Mr. Swatley also reportedly stated that the County Commission would have a tough time defending a map without any majority-minority districts based on the caselaw.

93.     Despite this advice regarding legal liability, concerns raised by County Commissioners and the public about the absence of majority-minority districts in the plan, and the County Commission's guidelines to avoid racially dilutive redistricting plans, the County Commission adopted the District 7 Split Modified Plan—which had no majority-minority districts—by a vote of 10 to 8.

94.     The District 7 Split Modified Plan was widely criticized after the November 16 County Commission meeting.

95.     Commissioner Leggett reportedly complained that the County Commission "chose not to listen to the attorney that we paid $10,000 of taxpayer money to get advice" from and instead "went against his advice to select this map that clearly discriminates against the African-American community." Dulce Torres Guzman, *Ground Zero for Voting Rights: Fayette County Redistricting Restricts Black Representation*, TENNESSEE LOOKOUT (Dec. 2, 2021), https://tennesseelookout.com/2021/12/02/ground-zero-for-voting-rights-fayette-county-redistricting-restricts-black-representation/.

96.     He also reportedly stated that, as a staunch conservative and Republican, what the County Commission did was not right.

97.     In response to concerns about potential lawsuits, he also reportedly stated that "there's no question about it, they have a case." *Id.*

98.     City of Piperton Mayor Coats reportedly criticized the map for overlooking Black voters, saying "that's the way this county has been since day one and it's still being done now." *Id.*

99.     Mayor Taylor called a County Commission special meeting for December 14, 2021.

100.     The purpose of the meeting was to add a single majority-minority district to the District 7 Split Modified Plan.

101.     During the meeting, the County Commission considered revised plans.

102.     Commissioner Oglesby moved to approve a resolution to replace the District 7 Split Modified Plan with a revised version ("7 District Split December 14 Modified Plan").

103.     Mr. Ryder reportedly reminded the County Commission that they must comply with the U.S. Constitution and VRA.

104.     Commissioner Powers reportedly asked Mr. Ryder what he thought about the 7 District Split Modified Plan passed by the County Commission on November 16 because it had no majority-minority districts.

105.     In response, Mr. Ryder reportedly said he would not feel comfortable defending that plan in court.

106.     Commissioner Goodroe discussed his modified version of the 19 District Plan ("19 District Modified Plan"), which he claimed included two majority-minority districts.

107.     Asked to compare the 19 District Modified Plan with Commissioner Oglesby's 7 District Split December 14 Modified Plan, Mr. Ryder reportedly explained to the County Commission that a plan with lower population deviation and greater numbers of majority-minority districts, in this case the 19 District Modified Plan, is more likely to survive in court.

108.    Fayette-Somerville NAACP member Civil Miller-Watkins addressed the County Commission, describing the 7 District Split December 14 Modified Plan as visually offensive and electorally inadequate.

109.    Ms. Miller-Watkins pointed out that the plan did not follow the County Commission's redistricting guidelines.

110.    She said that the plan showed that the County Commission was not thinking about the minority populations in Fayette County.

111.    County Commissioner Jim Norton reportedly implored the County Commission to listen to the advice of its attorney Mr. Ryder by adopting one of the plans with majority-minority districts.

112.    The County Commission, however, voted down a motion to substitute the 7 District Split December 14 Modified Plan with the 19 District Modified Plan.

113.    County Commissioner Tommy Perkins then moved to amend Commissioner Oglesby's motion to address the concerns around majority-minority districts by substituting the 14 District Plan, which Mr. Hill created and presented.

114.    The 14 District Plan had three majority-minority districts.

115.    The County Commission reviewed this plan.

116.    In a 10-9 vote, however, the County Commission voted down Commissioner Perkins' motion.

117.    The County Commission then voted on Commissioner Oglesby's original motion to approve the 7 District Split December 14 Modified Plan.

118.    Despite the County Commission's guidelines, concerns raised by County Commissioners and community members, and the advice of the County Commission's counsel,

the County Commission voted 12-6 (with one Commissioner abstaining) to approve the 7 District Split December 14 Modified Plan ("2021 Plan").

**C. The 2021 Plan's Impact**

119.    The 2021 Plan provides for no districts in which Black voters comprise a majority of the voting-age population.

120.    The 2021 Plan's effect has been to dilute Black political power in Fayette County by failing to provide Black voters with an opportunity to elect candidates of their choice.

121.    Under the 2021 Plan, six Black candidates ran in the 2022 general election for seats on the County Commission in Districts 4, 5, 6, 8 and 9, but were defeated in racially polarized elections.

122.    Sylvester Logan, a Black incumbent Commissioner in District 5, who had won elections for many years, lost to a white candidate in the 2022 Republican primary.

123.    For the first time in more than 20 years, there is no Black County Commissioner.

124.    On October 22, 2024, the County Commission met to appoint someone to fill a District 3 seat that was vacated by Commissioner Norton.

125.    Mayor Taylor received two recommendation letters—one for Ed Allen, who is white, and the other for Marlon Hill, who is Black—from the Fayette County Election Commission Board.

126.    Upon Commissioner Oglesby's motion, Mr. Allen was elected by acclamation.

**D. Vote Dilution in Fayette County**

127.    Congress passed the VRA in 1965.

128.    Congress reauthorized and amended the VRA in 1982 to provide, *inter alia*, that a Section 2 claim may be predicated on the discriminatory results of the challenged electoral mechanism.

129.    Following the 1982 amendments, the Supreme Court established in *Thornburg v. Gingles* a framework for assessing whether a redistricting plan dilutes minority voting strength. 478 U.S. 30, 50–51 (1986).

130.    Section 2, as interpreted in *Gingles*, prohibits redistricting schemes in which members of a racial minority group "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Allen v. Milligan*, 599 U.S. 1, 25 (2023) (quoting 52 U.S.C. § 10301(b)).

131.    The *Gingles* framework requires a plaintiff to satisfy three preconditions when challenging a redistricting scheme as dilutive of a racial minority group's voting power: (1) Black voters must be sufficiently large and geographically compact to constitute a majority in a single-member district, (2) Black voters must be politically cohesive, and (3) the majority must vote as a bloc to usually defeat Black voters' preferred candidate. 478 U.S. at 50–51; *see also Milligan*, 599 U.S. at 18.

132.    After establishing the *Gingles* preconditions, a plaintiff must prove that "based on the totality of circumstances, . . . the political processes leading to nomination or election" are "not equally open to participation by members of a class of citizens . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

133.    This "totality of circumstances" analysis is guided by a non-exhaustive set of factors enumerated in a Senate Report that accompanied the 1982 VRA amendments. *See* S. Rep.

No. 97-417, 97th Cong., 2d Sess. (1982) at 28–29. The totality of circumstances inquiry requires courts to conduct a "searching practical evaluation of the 'past and present reality.'" *Milligan*, 599 U.S. at 19, quoting *Gingles*, 478 U.S. at 79.

**Gingles *Preconditions***

134.    Plaintiffs satisfy the three *Gingles* preconditions for proving a vote dilution claim under Section 2 of the VRA.

135.    Based on the 2020 Census results, Fayette County's Black voting-age population is 26.2% and non-Hispanic white voting-age population is 67.6%.

136.    Fayette County's Black voting-age population is sufficiently numerous and geographically compact to form four majority-Black voting-age population single-member districts in a demonstrative plan with nineteen County Commission seats that complies with traditional redistricting principles.

137.    In the first of the four single-member districts under such a demonstrative plan, Fayette County's Black voting-age population is sufficiently numerous and geographically compact to form a single-member district that is situated around the City of Somerville.

138.    Under that same demonstrative plan, in the second illustrative single-member district, Fayette County's Black voting-age population is sufficiently numerous and geographically compact to form a single-member district that is situated around the City of Gallaway.

139.    Under that same demonstrative plan, in the third illustrative single-member district, Fayette County's Black voting-age population is sufficiently numerous and geographically compact to form a single-member district that is situated around the City of Moscow.

140.    Under that same demonstrative plan, in the fourth illustrative single-member district, Fayette County's Black voting-age population is sufficiently numerous and geographically

compact to form a single-member district that is situated around the central and southeast part of Fayette County in areas with high concentrations of Black voters.

141.    Black voters in the four districts with majority-Black voting-age populations would have an equal opportunity to elect their candidates of choice, despite the existence of racially polarized voting in Fayette County.

142.    Consistent with traditional redistricting principles, it is possible to devise other demonstrative plans containing different configurations of County Commission districts that would provide the opportunity for Black voters in Fayette County to elect their preferred candidates of choice.

143.    Voting in Fayette County is racially polarized.

144.    Racially polarized voting in Fayette County has been judicially recognized. *See, e.g.*, *Rural W. Tenn. Afr.-Am. Affs. Council, Inc. v. Sundquist*, 209 F.3d 835, 844 (6th Cir. 2000) ("Legislative elections in the six county area [including in Fayette County] are racially polarized.").

145.    Black voters in Fayette County are politically cohesive, and they consistently and overwhelmingly support the same candidates.

146.    White voters in Fayette County sufficiently vote as a bloc to enable them to usually defeat Black-preferred candidates in Fayette County elections.

147.    Although the Black population in Fayette County is more than 25% based on the 2020 census, no Black candidate has been elected to the County Commission under the 2021 Plan.

148.    The six Black candidates that ran for County Commission under the 2021 Plan lost in the general elections in racially polarized elections.

149.    A seventh Black candidate, who was an incumbent in District 5, lost in a 2022 Republican primary election under the 2021 Plan.

150.    In the 2018 County Commission general election contest for County Commission District 3 Position 1, Myles Wilson, a Black Fayette County resident running against a white candidate, lost the election but earned a significant amount of Black voter support.

### *Totality of Circumstances*

151.    Under the totality of circumstances, as informed by the congressionally delineated Senate Factors, Black voters in Fayette County have less opportunity than other members of the electorate to participate in the political process and elect candidates of their choice.

### *Historical and Ongoing Discrimination Against Black Voters in Voting*

152.    The 2021 Plan contributes to Fayette County's and Tennessee's long and continuing history of racial discrimination to produce racial disparities in political participation and representation.

153.    There is a judicially recognized history of racial discrimination in voting in Fayette County, as well as western Tennessee more broadly. *See, e.g.*, *Rural W. Tenn. Afr.-Am. Affs. Council*, 209 F.3d at 842; *United States v. Crockett Cnty.*, No. 1-01-1129, 2001 WL 37129749, at *2–3 (W.D. Tenn. Apr. 23, 2001); *Buchanan v. City of Jackson*, 683 F. Supp. 1537, 1545 (W.D. Tenn. 1988); *Taylor v. Haywood Cnty.*, 544 F. Supp. 1122, 1131 (W.D. Tenn. 1982).

154.    When Black residents of Fayette County began to register to vote in 1959, white landlords retaliated by evicting hundreds of Black families from their homes after the 1960 election.

155.    Registrars and sheriffs worked in concert to inform white landowners about those Black tenants who had registered to vote.

156.    White citizens also organized to retaliate against Black registered voters, denying them groceries, gasoline, and healthcare, and threatening and engaging in violence.

157.    Evicted Black residents lived in erected tents known as Tent Cities in Fayette County, which gained national attention and increased support for the passage of the VRA.

158.    Black voters in Fayette County also experienced discriminatory vote dilution before the adoption of the 2021 Plan.

159.    Tennessee's 1994 reapportionment of its state House districts violated Section 2 of the VRA by diluting minority votes in six counties in rural western Tennessee, including Fayette County. *Rural W. Tenn. Afr.-Am. Affs. Council*, 209 F.3d at 844.

### *Existence of Enhancing Practices Used Today*

160.    Fayette County uses several practices and procedures that, under the circumstances in Fayette County and with racially polarized voting, enhance the opportunity for discrimination against Black voters.

161.    The County Commission's use of a numbered post system, in which candidates in the eight multi-member districts run for designated seats, enhances vote dilution in Fayette County because it prevents Black voters, who are politically cohesive and overwhelmingly support the same candidates, from concentrating their votes on a single candidate.

162.    The County Commission primary and general elections are also not held at the same time as the primary and general elections for state and federal offices.

163.    Because of the state's felony disenfranchisement law, 16% of Tennessee's Black voting-age population cannot vote, which is a disenfranchisement rate nearly four times the national average for Black Americans.

*Continuing Discrimination and Its Effects in Other Socioeconomic Areas*

164.    There is an ongoing history of official and private discrimination in employment, housing, education, and other areas in Fayette County.

165.    Because of this history, Black people in Fayette County have a lower socioeconomic status and lag behind white residents in many crucial aspects of public life.

166.    Fayette County's Black population continues to experience the effects of discrimination.

167.    Racial disparities that exist statewide and in Fayette County are the legacy of the State's and County's policy decisions.

168.    These disparities interact with Fayette County's electoral system to make it harder for Black residents to participate fully in the political process and elect their preferred candidates.

169.    For example, Black residents have been and continue to be subjected to state-sanctioned discrimination in education.

170.    Fayette County Public Schools operated racially segregated schools well after the Supreme Court's decision in *Brown v. Board of Education*, 347 U.S. 483 (1954).

171.    In 1965, Black Fayette County students sued to desegregate Fayette County Public Schools, beginning a decades-long, still unfinished process of eliminating racial discrimination in the school district.

172.    Fayette County Public Schools have yet to eliminate the vestiges of *de jure* segregation and thus remain under federal court desegregation order.

173.    In 2012 and 2013, Fayette County Public Schools entered into consent orders to address its longstanding failure to desegregate predominately Black schools. *See generally*

*McFerren v. Cnty. Bd. of Educ. of Fayette Cnty.*, No. 65-136-STA-EGB, 2014 WL 12837563, at
*1-2 (W.D. Tenn. Mar. 5, 2014) (discussing the history of the 2012 and 2013 orders).

174.    In 2023, Fayette County Public Schools entered into a consent order to address
continued discrimination in the treatment of faculty and students, including in discipline and access
to the gifted program and advanced courses. Consent Order, *McFerren v. Cnty. Bd. of Educ. of
Fayette Cnty.*, No. 65-136-STA-EGB, ECF 198 (Oct. 11, 2023).

175.    As of 2024, a total of 2,787 students attend Fayette County Public Schools.

176.    Of those students, 56% are Black, 30% are white, and 11% are Hispanic.

177.    Fayette County Public Schools discipline Black students more harshly than white
students.

178.    During the 2023-24 school year, Black students were 2.43 times more likely than
white students to be in-school suspended, 2.76 times more likely to be out-of-school suspended,
2.67 times more likely to be expelled, and 4.52 times more likely to be assigned to the alternative
school.

179.    Students who are suspended, expelled, or assigned to alternative schools are more
likely to fall behind academically, drop out, and experience adverse mental health impacts.

180.    Black students in Fayette County Public Schools are less likely to be identified as
gifted or enrolled in advanced courses.

181.    Although Black students make up 56% of the student population, only 29% of
students identified as gifted are Black.

182.    Only a quarter (26%) of Black Fayette County Public School students graduate
ready for a career or postsecondary education, as compared to 49% of white students.

183.    Less than 17% of Black residents in Fayette County have a college degree or higher, as compared to nearly 29% of white residents.

184.    There are significant economic disparities between Black and white Fayette County residents.

185.    The mean per capita income for white residents in Fayette County is more than two times higher than that for Black residents.

186.    The median income of white households in Fayette County is more than twice that of Black households.

187.    Fayette County's Black population experiences poverty at a rate nearly five times higher than the white population.

188.    Only 1.5% of white residents in Fayette County are unemployed compared to 8.9% of Black residents.

189.    Present day income inequality is a direct effect of historical discrimination in Fayette County.

190.    Income and economic security are positively correlated with political participation.

191.    Black residents in Fayette County are less likely than white residents to have health insurance.

192.    Black residents in Fayette County are less likely to own their homes and more likely to rent than white residents.

193.    Home ownership and housing stability are positively correlated with political participation.

194.    Black people in Fayette County are disproportionately incarcerated and disenfranchised under state law.

195.    While Black people comprise more than 25% of Fayette County's population overall, 62% of incarcerated people in Fayette County are Black.

196.    Due to Tennessee's felony disenfranchisement laws, these disparities in incarceration rates have a direct effect on the opportunity of Black voters in Fayette County to elect candidates of their choice.

### *Lack of Black or Black-Preferred Candidates Elected to Office*

197.    The harms of the 2021 Plan, along with the totality of circumstances in Fayette County, result in the stark underrepresentation of the Black community in public office.

198.    Although Fayette County's Black population is above 25%, no Black commissioners serve on the County Commission.

199.    Under the 2021 Plan, all Black candidates who ran for a county commission seat in 2022 lost.

200.    Upon information and belief, no Black resident has ever held any countywide elected position.

201.    No Black resident has represented Fayette County as a state senator or as a state representative since at least the period of Reconstruction after the Civil War.

### *Non-responsiveness*

202.    Black people's lack of representation in public office has contributed to the failure of elected officials to respond to the particularized needs of the Black community in Fayette County.

203.    During the redistricting process, Black residents repeatedly requested a map that included majority-minority districts, but those requests were rejected by the County Commission.

204.    The County Commission also continues to reject funding requests from the Fayette County Board of Education, which oversees a school district that has a 56% Black student body and remains subject to desegregation orders.

205.    Black residents have repeatedly called on the County Commission to approve additional funds for the school district so that it can fulfill its ongoing constitutional obligations.

206.    In 2024, the County Commission again turned down the Board of Education's budget request.

207.    In a letter to the County Commission criticizing the decision, the Fayette-Somerville NAACP highlighted the fact that the County Commission had approved raises for the fire chief and sheriff but not for educators in the predominately Black school system and demanded better representation from the county government.

208.    The County Commission ignored requests from Black residents for improvements to the Senior Enrichment Center in Somerville, a facility that serves predominately Black seniors across the County.

209.    The County Commission has also refused to grant a lease to Black residents seeking to reestablish control over the Bernard Community Center. The facility was used by the predominately Black surrounding community for family gatherings, senior breakfasts, and movie nights for twenty years until 2023, when the Fayette County Mayor shut its doors to bring the center under County oversight.

210.    Since then, Black residents have been requesting that the County Commission lease a portion of the 7.4-acre property back to the Bernard community, preparing paperwork and attending committee meetings as requested by the Commission, to no avail.

*Tenuous Policy Justifications*

211. The contemporaneous reasons stated for passing the 2021 Plan were tenuous.

212. The Commissioner who introduced the 2021 Plan at the December 14, 2021 special meeting claimed that creating a "true majority-minority District 7" was the purported reason for enacting the Plan.

213. District 7, however, is not a majority-minority district under the 2021 Plan because it is not comprised of a majority of Black voters.

214. The County Commission claimed the 2021 Plan was enacted to preserve the status quo and to protect incumbents from being paired in the same district and having to compete against each other.

215. Several Commissioners, however, had to switch districts to run under the 2021 Plan.

## CLAIMS FOR RELIEF

**Count One: Results-Based Racial Vote Dilution**
**Section 2 of the Voting Rights Act of 1965 (52 U.S.C. § 10301; 42 U.S.C. § 1983)**

216. Plaintiffs re-allege and incorporate by reference paragraphs 1-215 as fully set forth herein.

217. Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, as enforceable both under the private right of action authorized by Section 2 and under 42 U.S.C. § 1983, prohibits the enforcement of any voting qualification or prerequisite to voting or any standard, practice, or procedure that results in the denial or abridgment of the right of any U.S. citizen to vote on account of race, color, or membership in a language minority group.

218.    Black voters in Fayette County are sufficiently numerous and geographically compact enough to form up to four reasonably configured single-member districts comprised of a majority of Black voters.

219.    Voting in Fayette County is racially polarized.

220.    Black voters in Fayette County are politically cohesive and overwhelmingly support the same candidates in elections in Fayette County.

221.    But a white majority of voters vote as a bloc with the usual result of defeating Black voters' preferred candidates of choice in elections in Fayette County.

222.    Considering the totality of the circumstances in Fayette County, Plaintiffs and other Black residents of Fayette County have less opportunity than other members of the county electorate to participate in the political process and to elect representatives of their choice to the County Commission.

223.    Among other factors, there is a long history and ongoing pattern of discrimination in voting, education, employment, and other areas of life against Black voters in Fayette County, which impact Black voters' ability to participate equally in the political process; Fayette County uses numbered posts and other election practices that enhance the opportunity for discrimination; Black people are underrepresented on the County Commission and in other elected offices; the County Commission has been unresponsive to the concerns of Black voters in Fayette County; and the contemporaneous justifications advanced for the 2021 Plan are tenuous.

224.    These facts demonstrate that the 2021 Plan results in the dilution of Black voter strength in violation of Section 2, 52 U.S.C. § 10301 and 42 U.S.C. § 1983.

225.    Plaintiffs have no adequate remedy at law other than the judicial relief sought in this case.

226.    The failure to permanently enjoin the conduct of elections under the 2021 Plan and order the creation of remedial maps will irreparably harm Plaintiffs by subjecting them to racial vote dilution.

**Count Two: Intentional Vote Dilution**
**Fourteenth and Fifteenth Amendments (U.S. Const. amends., XIV and XV; 42**
**U.S.C. §1983) and Section 2 of the Voting Rights Act (52 U.S.C. § 10301; 42 U.S.C. § 1983)**

227.    Plaintiffs re-allege and incorporate by reference paragraphs 1-215 as fully set forth herein.

228.    The Equal Protection Clause of the Fourteenth and Fifteenth Amendments to the U.S. Constitution forbid government bodies from enacting laws for which a racially discriminatory intent or purpose is a motivating factor. *See, e.g.*, *Allen v. Milligan*, 599 U.S. 1, 11 (2023).

229.    In addition to prohibiting discriminatory results, as discussed above, Section 2 of the VRA, like the U.S. Constitution, also prohibits laws adopted with a discriminatory purpose. 52 U.S.C. § 10301; *see, e.g.*, *Chisom v. Roemer*, 501 U.S. 380, 394 n.21 (1991).

230.    The facts alleged herein reveal that the 2021 Plan was adopted, at least in part, with an intent to racially discriminate against Black voters in violation of the U.S. Constitution and Section 2 of the VRA.

231.    The 2021 Plan has a discriminatory impact on Black voters in Fayette County, which was foreseeable and repeatedly raised by elected officials and community members during the redistricting process.

232.    The 2021 Plan provides no electoral opportunities for Black voters in Fayette County, and none of the nineteen Commissioners are Black.

233.    Other direct and circumstantial evidence raises a strong inference of a discriminatory purpose motivating the enactment of the 2021 Plan, including: Fayette County's and Tennessee's well-documented history and ongoing record of discrimination against Black

voters; the contemporaneous statements made during the redistricting process by County Commissioners and community members, including legal advice that the 2021 Plan could have a racially discriminatory harm; and the sequence of events and non-transparent process which led to the enactment of the 2021 Plan, including the County Commission's disregard of its legal counsel's advice to adopt alternative plans, offered by members of the public and other elected officials, that would have been less dilutive than the enacted plan and thus mitigated the harm to Black voters.

234.    Plaintiffs have no adequate remedy at law other than the judicial relief sought in this case.

235.    The failure to enjoin the conduct of elections under the 2021 Plan and order remedial maps will irreparably harm Plaintiffs by subjecting them to an intentionally racially discriminatory map.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

A.  Declare the district boundaries adopted in the 2021 Plan to be a violation of Section 2 of the VRA;

B.  Declare the district boundaries adopted in the 2021 Plan to be unconstitutional under the Fourteenth and Fifteenth Amendments to the U.S. Constitution;

C.  Permanently enjoin Defendants, their agents, and all persons acting in concert with Defendants from holding County Commission elections under the 2021 Plan;

D.  Direct Defendants, their agents, and all persons acting in concert with Defendants to take appropriate action to ensure compliance with this Court's orders by authorities administering Fayette County's electoral processes;

E.   Order expedited hearings and briefing, consider evidence, and take any other action necessary for this Court to order a VRA and constitutionally compliant plan for new County Commission districts;

F.   Set an immediate and reasonable deadline for Defendants to adopt and enact a County Commission redistricting plan that (1) includes four reasonably configured single-member districts in which Black voters comprise the majority in each of the districts, (2) does not dilute, cancel out, or minimize the voting strength of Black Fayette County voters or subject them to racially discriminatory districts, and (3) does not violate the VRA, federal and state constitutions, and other applicable laws;

G.   Retain jurisdiction over this matter until Defendants have complied with all of this Court's orders and mandates;

H.   Retain jurisdiction over this matter for such a period this Court deems appropriate and require Defendants to submit future redistricting plans for preclearance review from this court or the U.S. Attorney General under Section 3(c) of the VRA, 52 U.S.C. § 10302(c);

I.   Award Plaintiffs' attorneys' fees and costs of their suit; and

J.   Grant such other and further relief as this Court deems just and proper.

Dated:  February 27, 2025

Respectfully submitted,

/s/ *Donald A. Donati*
Donald A. Donati (TN Bar No. 8633)
Bryce W. Ashby (TN Bar No. 26179)
Melissa J. Stewart (TN Bar. No. 40603)
DONATI LAW, PLLC
1545 Union Ave.
Memphis, TN 38104
Telephone: 901-278-1004
Fax: 901-278-3111
don@donatilaw.com
bryce@donatilaw.com
melissa@donatilaw.com

/s/ *Breanna Williams*
John S. Cusick*
Brenda Wright*
Breanna Williams
Allison Scharfstein*
Leah Aden*
NAACP LEGAL DEFENSE &
 EDUCATIONAL FUND, INC.
40 Rector Street, 5th Fl.
New York, NY 10006
Tel: (212) 965-2200
Fax (202) 226-7592
jcusick@naacpldf.org
bwright@naacpldf.org
bwilliams@naacpldf.org
ascharfstein@naacpldf.org
laden@naacpldf.org

* *Motion for admission forthcoming*

*Counsel for Plaintiffs*